UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KILEY L. BENITEZ-WHITE | § | |
| and others similarly situated | § | |
| | § | **CIVIL ACTION NO. 4:20-CV-1562** |
| **Plaintiffs** | § | |
| | § | |
| | § | |
| VS. | § | |
| | § | |
| PEOPLES REPUBLIC OF CHINA and | § | **CLASS ACTION COMPLAINT** |
| COMMUNIST PARTY OF CHINA | § | |
| | § | |
| **Defendants** | § | |

**CLASS ACTION COMPLAINT**

TO THE HONORABLE U.S. DISTRICT JUDGE:


**COME NOW**, Kylie L. Benitez-White and others ("Plaintiffs"), by and through their attorneys, and bring this action on behalf of themselves and all others similarly situated against the PEOPLES REPUBLIC OF CHINA ("PRC") and the COMMUNIST PARTY OF CHINA ("CPC"), collectively "DEFENDANTS". Plaintiffs hereby allege, on information and belief, except as to those allegations which pertain to the named Plaintiffs, which allegations are based on personal knowledge, as follows:

**I. NATURE OF THE ACTION**

1.      Plaintiffs bring this class action on behalf of U.S. residents who were affected by the 2020 outbreak of COVID-19, also known as Coronavirus.

2.      Through negligence, carelessness, and purposeful subterfuge, Defendants unleashed an epidemic across the United States that has been traced back to China's only Biosafety Level 4 containment lab in Wuhan, China.

1

3.      Despite multiple warnings from various U.S. agencies, Defendants operated the Wuhan Biosafety Level 4 lab in an unsafe and negligent manner that led to the outbreak of COVID-19. This disease outbreak and subsequent pandemic has caused more than 70,000 deaths in the United States, loss of jobs, loss of economic activity, and permanent damage to the survivors of the epidemic.

4.      By selling a large portion of its goods in Texas, delivering shipping containers and automobiles with a yearly value of $1.83 Billion dollars through the Port of Houston, and collecting payments for goods shipped to Texas, DEFENDANTS have availed themselves to the laws of the State of Texas and the United States.

5.      Due to their negligence, wrongful acts, neglect, carelessness, unskillfulness, and default, DEFENDANTS are liable to residents of Texas and the United States, under Texas and Federal law.

6.      Plaintiffs bring this class action on behalf of themselves and all others similarly situated, asserting claims including death, personal injury, and economic losses under Texas law, the Justice Against Sponsors of Terrorism Act (JASTA) codified as 18 USC § 2333 (amended by the federal Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016)), and claims under common law.

7.      Plaintiffs seek damages and equitable relief on behalf of the class, which relief includes but is not limited to the following: providing class members with compensation for death or injury, loss of employment, and business losses; costs and expenses, including attorney's fees; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiffs and the Class.

## II. U.S. CONGRESSIONAL DELEGATION NOTES DEFENDANTS PRC AND CPC RESPONSIBLE FOR COVID-19 PANDEMIC

8.     On April 16, 2020, U.S. Representative Dan Crenshaw (R-Texas) and U.S. Senator Tom Cotton (R-Arkansas) introduced legislation that would allow Americans to seek compensation from DEFENDANTS due to DEFENDANTS' negligence and actions in allowing the COVID19 virus to spread into the general population and attempting to coverup the outbreak for political reasons, that led to more deaths.

9.     Congressman Crenshaw notes the following:

"We need to hold the Chinese government accountable for their malicious lies and coverup that allowed the coronavirus to spread across the world. The communist regime expelled journalists, silenced whistleblowers, and withheld vital information that delayed the global response to the pandemic. Simply put: their actions cost American lives and livelihoods. This bill will help ensure China's actions are not without consequences."

*Posted* April 16, 2020 on Congressman Crenshaw's webpage. *See* https://crenshaw.house.gov/news/documentsingle.aspx?DocumentID=267

10.     Senator Cotton notes the following:

"By silencing doctors and journalists who tried to warn the world about the coronavirus, the Chinese Communist Party allowed the virus to spread quickly around the globe. Their decision to cover up the virus led to thousands of needless deaths and untold economic harm. It's only appropriate that we hold the Chinese government accountable for the damage it has caused."

*Posted* April 16, 2020 on Congressman Crenshaw's webpage. *See* https://crenshaw.house.gov/news/documentsingle.aspx?DocumentID=267

11.     The statements made by Congressman Crenshaw and Senator Cotton are also significant, because these two members of Congress have access to daily classified briefings that contain significantly more information on the origin of COVID-19, than the general public has been privy to.

### III. U.S. SCIENTISTS PREVIOUSLY WARNED DEFENDANTS ABOUT LAPSES IN WUHAN BIOSECURITY LEVEL 4 LAB PROCEDURES, SAFETY, AND PROTOCOL THAT COULD LEAD TO AN PANDEMIC

12.     Prior to the statements by Senator Cotton and Congressman Crenshaw, U.S. State Department Officials noted that the safety protocols and procedures at the Wuhan Biolab (the only Level 4 Biosecurity Site in China), were lacking and created an extremely dangerous situation.

13.     In January 2018, the U.S. Embassy in Beijing took the unusual step of repeatedly sending U.S. science diplomats to the Wuhan Institute of Virology (WIV)[1] to conduct safety audits and report back to the embassy.

14.     The scientists were alarmed because the Wuhan lab lacked basic safety protocols and was being operated in a dangerous manner. The scientists' observations were written into a cable drafted by the U.S. Embassy and forwarded to the U.S. State Department. The cable notes:

> "During interactions with scientists at the WIV laboratory, they noted the new lab has a serious shortage of appropriately trained technicians and investigators needed to safely operate this high-containment laboratory."

15.     As the cable stated, the U.S. visitors met with Shi Zhengli, the head of the research project, who had been publishing studies related to bat coronaviruses for many years. In November 2017, just before the U.S. officials' visit, Shi's team had published research showing that horseshoe bats they had collected from a cave in Yunnan province

_____

1 - In 2015, the Wuhan lab became China's first laboratory to achieve the highest level of international Biosafety (known as BSL-4)

were very likely from the same bat population that spawned the SARS coronavirus in

2003.

16. The cable added:

"Most importantly, the researchers also showed that various SARS-like coronaviruses can interact with ACE2, the human receptor identified for SARS-coronavirus. This finding strongly suggests that SARS-like coronaviruses from bats can be transmitted to humans to cause SARS-like diseases. From a public health perspective, this makes the continued surveillance of SARS-like coronaviruses in bats and study of the animal-human interface critical to future emerging coronavirus outbreak prediction and prevention."

*See* Washington Post. 'State Department Cables Warned of Safety Issues in Wuhan Lab Studying Bat Coronaviruses', https://www. washingtonpost.com/opinions/2020/04/14/state-department-cables-warned-safety-issues-wuhan-lab-studying-bat-coronaviruses/ accessed April 22, 2020.

17. The dangerousness of this type of research is well-known. In fact, in

October 2014, the U.S. government imposed a moratorium on funding of any research

that makes a virus more deadly or contagious, known as 'gain of function' experiments.

*Id.*

## IV. INTELLIGENCE DOSSIER PREPARED BY THE USA, UK, CANADA, AUSTRALIA, AND NEW ZEALAND NOTES WUHAN LAB WAS STUDYING AND MODIFYING BAT CORONAVIRUSES PRIOR TO OUTBREAK

18. In April 2020, Western Intelligence agencies released a report linking the

coronavirus research in the Wuhan Biosafety Level 4 lab, to the COVID-19 pandemic.

The report noted that the Wuhan researchers, including Dr. Shi Zhengli, collected a

sample of horseshoe bat feces that contained a virus that was 96.2% identical to COVID-

19.

19.     The Wuhan lab team was also conducting research to synthesize SARS-like coronaviruses to determine whether the viruses could be transmissible from bats to mammals. Furthermore, a November 2015 study produced by the Wuhan researchers and Dr. Shi Zhengli noted that the lab created SARS-like viruses that could jump from bats to humans and there was no treatment.

20.     Dr. Shi Zhengli's study notes:

"To examine the emergence potential (that is, the potential to infect humans) of circulating bat CoVs, we built a chimeric virus encoding a novel, zoonotic CoV spike protein — from the RsSHCO14-CoV sequence that was isolated from Chinese horseshoe bats — in the context of the SARS-CoV mouse-adapted backbone."

21.     The co-author of Dr. Zhengli's paper, Professor Ralph Baric said the following about the Wuhan lab-created virus in an interview with Science Daily:

"This virus is highly pathogenic and treatments developed against the original SARS virus in 2002 and the ZMapp drugs used to fight Ebola fail to neutralise and control this particular virus."

22.     Even more troubling, the Wuhan researchers were also transporting live, wild-caught bats from Australia to be dissected and studied to identify more deadly coronaviruses.

23.     The COVID-19 virus was kept in the Wuhan lab until late 2019 when an employee violated safety protocols and caused the release of the virus into the local population. The Wuhan lab worker, researcher Huang Yan Ling, is believed to be patient zero. She was apprehended and arrested by DEFENDANTS after a news report from the

South China Morning Post indicated that Ling was patient zero. To date, Huang Yan Ling's whereabouts are unknown.

24. On December 31, 2019, Chinese authorities began censoring news of the virus from search engines, deleting terms including "SARS variation, "Wuhan Seafood market" and "Wuhan Unknown Pneumonia." On January 1, 2020, without any investigation into where the virus originated from, the Wuhan seafood market was closed and disinfected.

25. The following are key dates in DEFENDANTS' efforts to cover-up the COVID-19 outbreak:

| | |
|---|---|
| NOV 9, 2015 | Wuhan Institute of Virology publish a study revealing they created a new virus in the lab from SARS-CoV. |
| DEC 6, 2019 | Five days after a man linked to Wuhan's seafood market presented pneumonia-like symptoms, his wife contracts it, suggesting human to human transmission. |
| DEC 27, 2019 | China's health authorities told a novel disease, then affecting some 180 patients, was caused by a new coronavirus. |
| DEC 26-30, 2019 | Evidence of new virus emerges from Wuhan patient data. |
| DEC 31, 2019 | Chinese internet authorities begin censoring terms from social media such as Wuhan Unknown Pneumonia. |
| JAN 1, 2020 | Eight Wuhan doctors who warned about new virus are detained and condemned. |
| JAN 3, 2020 | China's top health authority issues a gag order. |
| JAN 5, 2020 | Wuhan Municipal Health Commission stops releasing daily updates on new cases. Continues until January 18. |

| | |
|---|---|
| JAN 10, 2020 | PRC official Wang Guangfa says outbreak "under control" and mostly a "mild condition". |
| JAN 12, 2020 | Professor Zhang Yongzhen's lab in Shanghai is closed by authorities for "rectification", one day after it shares genomic sequence data with the world for the first time. |
| JAN 14, 2020 | PRC National Health Commission chief Ma Xiaowei privately warns colleagues the virus is likely to develop into a major public health event. |
| JAN 24, 2020 | Officials in Beijing prevent the Wuhan Institute of Virology from sharing sample isolates with the University of Texas. |
| FEB 6, 2020 | China's internet watchdog tightens controls on social media platforms. |

26.     After the outbreak, officials with the Chinese Communist Party attempted to stem the flow of information about the outbreak by arresting doctors, suspending news reports, removing information from websites, and sequestering scientists who worked at the Level 4 Biosecurity lab in Wuhan. In addition, DEFENDANTS spread a false narrative that the virus came from the local wet market, when in fact the local market does not sell dead bats, live bats, or bat soup.

27.     Ultimately, DEFENDANTS' actions to control information and save face, led to more infections, deaths, loss of jobs, loss of businesses, and economic damages in the United States.

28.     What started off as an infected employee in a Biosecurity Level 4 lab in Wuhan morphed into a worldwide pandemic that changed the fabric of life in the United States with the deaths of more than 70,000 U.S. residents and the loss of millions of jobs.

29.     The proximate cause of these damages to U.S. citizens and class members

are the DEFENDANTS' wrongful acts, neglect, negligence, carelessness, unskillfulness, and default.

## V. JURISDICITON AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 18 USC § 2333 (amended by the federal Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016)) and 28 U.S.C. §§1331, 1332, and 1367, because Plaintiffs' claims arise under federal statute.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

31.     This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) ("CAFA"), as to the named Plaintiffs and every member of the Class, because the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5 million, and members of the Class reside across the United States and are therefore diverse from Defendant.

32.     This Court has jurisdiction over Defendants because Defendants have availed themselves to the laws of the United States by conducting significant business in the United States and exporting goods with a value of $120.3 Billion dollars to the United States in 2018.

33.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is proper in this District as Lead Plaintiff lives in this District and lost her job in this District. Venue is also proper under 18 U.S.C. §1965(a), because Defendants transact a substantial amount of their business in this District through the Port of Houston, which receives $1.83 Billion dollars of Defendants' yearly exports to the United

States. Defendants are also the second top exporting country that utilizes the Port of Houston. *See* U.S. Trade Numbers and U.S. Census data https://www.ustradenumbers. com./port/port-of-houston, accessed on April 22, 2020.


## VI. PARTIES

34.     Plaintiff Kiley L. Benitez-White ("Ms. Benitez") resides in Conroe, Texas. Ms. Benitez was employed by C&A Peppers Properties but was laid off in March 2020 due to the COVID-19 pandemic.

35.     Defendants Peoples Republic of China ("PRC") and Communist Party of China ("CPC") are based overseas yet conduct substantial business in the State of Texas by delivering more than $1.83 Billion dollars' worth of goods to the United States through the Port of Houston.

36.     Defendants PRC and CPC do not have sovereign immunity under the Joint Sponsors of Terrorism Act (JASTA, 18 USC §2333). Defendant CPC does not have sovereign immunity as it is a political party, and not a sovereign country.

37.     Defendants are not signatories to the Hague Convention and can be served via 28 USC §1608 (a)(3).


## VII. DEFENDANT'S UNLAWFUL CONDUCT

38.     Since the mid 2010s, Defendants have operated a Biosecurity Level 4 lab in Wuhan, China. The initial purpose of the lab was to study and develop treatments for novel coronaviruses, MERS, and other contagious and communicable diseases.

39.     On or about May 2015, one of the head scientists at the Wuhan

Biosecurity Level 4 lab began to track and trace novel coronaviruses in bats. Part of the

research involved harvesting these viruses from various bat populations in Southern

China. Many of these viruses had not been transmitted to humans yet. This harvesting

represented an opportunity to study new or novel coronaviruses and how they would

respond to various types of treatment.

40.     However, this capture and collection of bat specimens and novel

coronaviruses was also dangerous, as an outbreak due to improper lab procedures and

safety measures was a major risk to the populace, since these viruses are deadly to

humans.

41.     Visits by U.S. scientists and diplomatic cables from the U.S. Embassy in

Beijing, China to the U.S. State Department reiterated these dangerous conditions and

lack of safety protocols to include: inadequate storage, inadequate disposal, and improper

use of safety equipment.

42.     The cables noted that the DEFENDANTS Wuhan lab was experimenting

with bat-derived coronaviruses:

> "Most importantly, the researchers also showed that various SARS-like
> coronaviruses can interact with ACE2, the human receptor identified for
> SARS-coronavirus. This finding strongly suggests that SARS-like
> coronaviruses from bats can be transmitted to humans to cause SARS-like
> diseases. From a public health perspective, this makes the continued
> surveillance of SARS-like coronaviruses in bats and study of the animal-
> human interface critical to future emerging coronavirus outbreak
> prediction and prevention."

> *See* Washington Post. 'State Department Cables Warned of Safety
> Issues in Wuhan Lab Studying Bat Coronaviruses', https://www.
> washingtonpost.com/opinions/2020/04/14/state-department-
> cables-warned-safety-issues-wuhan-lab-studying-bat-

coronaviruses/ accessed April 22, 2020.

43.     Upon information and belief, the patient zero that unleashed the COVID-19 pandemic was a lab tech working at the Biosecurity Level 4 lab in Wuhan. The lab tech was told to destroy some samples of COVID-19, but due to improper safety protocols, the lab tech became infected with COVID-19 and subsequently released the virus to a major population center in Wuhan, China.

44.     The whereabouts of the Wuhan Biosecurity Level 4 lab tech and the lab's chief scientist are unknown. It is believed that they were detained and sequestered by Defendants, with the possibility that they were imprisoned or executed for their errors.

45.     Rather than admit the outbreak occurred and take immediate steps to deal with the contagion, the Defendants worked together to quash, hide, and discount the story about the outbreak.

46.     In fact, one of the local Wuhan medical doctors (not affiliated with the Biosecurity Level 4 lab) who began to report about the COVID-19 outbreak was arrested and subsequently punished for causing a panic and creating dissent. This same doctor, Dr. Li Wenliang, later became infected with COVID-19 and died on Feb 6, 2020.

47.     Due to Defendants' actions of: a) improperly operating a Biosecurity Level 4 lab in Wuhan, China then b) taking proactive steps to cover-up the outbreak, Defendants unleased a plague and viral pandemic upon the world.

48.     As the United States is the Defendants' largest trade partner, the United States and its residents have been hit hardest by the epidemic.

49.     As of May 1, 2020, more than 70,000 U.S. residents have died, hundreds of thousands have been hospitalized, and millions of Americans have lost their jobs and

economic livelihood.

50.     Defendants have a history of lax safety protocols, political oppression, heavy-handed tactics towards whistleblowers, and severe human rights abuses to include the harvesting and sale of organs from political prisoners. These deceptive actions, negligence, and misconduct can only be remedied through Class Action litigation.

## VIII. PLAINTIFFS' ALLEGATIONS

51.     Plaintiffs are U.S. residents who have suffered personal injury and economic damages due to Defendants' misconduct.

52.     Plaintiffs learned that far from being the only ones experiencing such problems with the Defendants, there were hundreds of thousands of other residents with similar complaints.

53.     Plaintiffs have suffered injury in fact and loss of life, money, or property, and they have been damaged in varying amounts depending on the type of losses they experienced. These classmembers will be organized in groups, according to their respective damage models, in the forthcoming class definition to be provided at Class certification.

## IX. CLASS ALLEGATIONS

54.     Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

55.     The proposed class consists of all U.S. residents and businesses that were affected by the COVID-19 pandemic through and including the date of the class notice

(the "Class").

56.     This action is properly brought as a class action for the following reasons:

a.      proposed class is so numerous and geographically dispersed throughout the United States that the joinder of all class members is impracticable. When Plaintiffs do not know the exact number and identity of all class members, Plaintiff believes there are tens if not hundreds of thousands of class members;

b.      the disposition of Plaintiffs' and proposed class members' claims in a class action will provide substantial benefits to both parties and the Court;

c.      the proposed class is ascertainable and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each proposed class member were infringed or violated in the same fashion;

d.      there are questions of law and fact common to the proposed class which predominate over any questions that may affect particular class members. Such common questions include:

(i) Whether Defendants are liable for damages arising from the COVID-19 pandemic that was the proximate cause of classmembers' death, injury, disability, loss of income, or loss of job, due to the Defendants, or Defendants' agents, or Defendants' servants: wrongful act, neglect, carelessness, unskillfulness, or default.

(ii) In the instant case, Defendants' wrongful act, neglect, and/or

carelessness in the operation of the Wuhan Biosecurity Level 4 Containment Lab was the proximate cause that led to Plaintiffs' injuries.

Specifically, that:

(1) Defendants operated a lab that was used to track and study live bat coronaviruses that were dangerous and contagious to humans.

(2) Defendants were repeatedly warned that the lab was not following Level 4 Biocontainment Safety protocols.

(3) Defendants hired and supervised staff that were untrained and not qualified to maintain safety protocols.

(4) One of Defendants' employees was ordered to destroy live virus samples including a sample of the COVID-19 contagion, otherwise known as the 'novel coronavirus'.

(5) Instead of destroying the sample, the Defendants' employee became infected, due to improper lab protocols, and then inadvertently released COVID-19 into the general population in Wuhan, China.

(6) When the first contagion clusters were detected in Wuhan, China, Defendants immediately began a campaign to silence, discredit, and stop the release of information identifying COVID-19 as a virus that was being studied at the Wuhan Biosecurity Level 4 lab.

(7) Defendants arrested, sequestered, and silenced medical personnel who identified the outbreak and were determined

to stop the COVID-19 outbreak at an early stage.

(8) This cover-up led to even more deaths and injury as the virus was able to cross borders through international airline travel.

(9) Due to the high infection rate of COVID-19, and the actions and inactions of Defendants, tens of thousands of U.S. residents have died, many more have been hospitalized, and millions are unemployed.

(ii)     Whether Defendants improperly operated the Biosecurity Level 4 lab in Wuhan, China.

(iii)     Whether Defendants are strictly liable to Plaintiffs and the class and whether Defendants failed to warn Plaintiffs and the class;

(iv)     Whether Defendants are liable to Plaintiffs under Texas Wrongful Death statutes;

(v)     Whether Defendants are liable to Plaintiffs for Plaintiffs' economic losses and damages;

(vi)     Whether Defendants are liable to Plaintiffs for Plaintiffs' personal injury;

(vii)     Whether Plaintiffs and proposed class members have been harmed and the proper measure of relief;

(viii)     Whether Defendants violated Title 18 USC § 2333 (amended by the federal Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016)) and 28 U.S.C. §§1331, 1332; and

(ix)     Whether Plaintiffs and proposed class members are entitled

to an award of punitive damages, attorney's fees and expenses against Defendants.

e.     Plaintiffs' claims are typical of the claims of the members of the proposed class.

f.      Plaintiffs will fairly and adequately protect the interests of the proposed class in that they have no interests antagonistic to those of the other proposed class members, and Plaintiffs have retained attorneys qualified in consumer class actions, business litigation, multi-district litigation, and complex litigation as counsel.

g.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(i)     Given the size of individual proposed class member's claims and the expense of litigating those claims, few, if any, proposed class members could afford to or would seek legal redress individually for the wrongs Defendants committed against them and absent proposed class members have no substantial interest in individually controlling the prosecution of individual actions;

(ii)     This action will promote an orderly and expeditious administration and adjudication of the proposed class claims, economies of time, effort, and resources will be fostered and uniformity of decisions will be insured;

(iii)     Without a class action, proposed class members will

continue to suffer damages, and Defendants' violations of law will proceed without remedy while Defendants continues to reap and retain the substantial proceeds of its wrongful conduct; and

(iv)    Plaintiffs know of no difficulty that will be encountered in the management of this litigation, which would preclude its maintenance as a class action.

57.    Plaintiffs seek damages and equitable relief on behalf of the proposed class on grounds generally applicable to the entire proposed class.


## X. FIRST CAUSE OF ACTION
### (Wrongful Death)

58.    Plaintiffs re-allege and incorporate by reference the allegations contained.

59.    In Texas, an entity (or country) is liable for damages arising from an injury that causes an individual's death if the injury was caused by the entity's (or country's) or his agents' or servants':

a)    wrongful act,

b)    neglect,

c)    carelessness,

d)    unskillfulness,

e)    or default.

60.    In the instant case, the Defendants' wrongful act, neglect, and/or carelessness in their operation of the Wuhan Biosafety Level 4 lab was the proximate cause of classmembers' death.

## XI. SECOND CAUSE OF ACTION
### (Personal Injury)

61.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

62.     This cause of action arises under the Texas Personal Injury statutes. In Texas, the theory of negligence is based upon: a) the defendant owed the victim a duty of care, b) the defendant breached this duty it owed to the plaintiff, c) the breach caused the victim to suffer an injury, and d) the victim suffered damages stemming from the injury.

63.     In the instant case, Defendants negligently operated a Biosecurity Level 4 Containment Lab in Wuhan, China that led to an outbreak of COVID-19.

64.     The Defendants were negligent in the collection and study of novel coronaviruses in bats, including COVID-19, a virus that is fatal to humans.

65.     The Defendants were negligent in the disposal of COVID-19. A lab tech was ordered to destroy various active COVID-19 samples. However, due to improper training and safety protocols, the lab tech became infected with COVID-19 and then released the contagion into the general population.

66.     The Defendants discovered the release of COVID-19 into the general population then intentionally began a cover-up to hide the release.

67.     Defendants then began a disinformation campaign that blamed the United States and the United States Army as the source of the COVID-19 outbreak.

68.     Defendants' negligence was the proximate cause of personal injuries suffered by the class members. These personal injuries include death, hospitalization, infection, permanent damage to lungs, and other physical ailments.

## XII. THIRD CAUSE OF ACTION
### (Gross Negligence)

69.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

70.     In Texas, the theory of gross negligence is based on an objective and subjective component. That is: 1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and 2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex. 2001).

71.     In the instant case, Defendants operated a Biosecurity Level 4 Containment Lab in Wuhan, China with gross negligence that led to an outbreak of COVID-19.

72.     The Defendants were grossly negligent in the collection and study of novel coronaviruses in bats, including COVID-19, a virus that is fatal to humans.

73.     The Defendants were grossly negligent in the disposal of COVID-19. A lab tech was ordered to destroy various active COVID-19 samples. However, due to improper training and safety protocols, the lab tech became infected with COVID-19 and then released the contagion into the general population.

74.     The Defendants discovered the release of COVID-19 into the general population then intentionally began a cover-up to hide the release.

75.     Defendants then began a disinformation campaign that blamed the United States and the United States Army as the source of the COVID-19 outbreak. Defendants

actions were again grossly negligent.

76.     Defendants' gross negligence was the proximate cause of personal injuries and economic losses suffered by the class members. These personal injuries include death, hospitalization, infection, permanent damage to lungs, and other physical ailments.


### XIII. FOURTH CAUSE OF ACTION
### (Respondeat Superior)

77.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

78.     In Texas, under the doctrine of *respondeat superior,* an employer can be held vicariously liable for the tortious acts of its employees conducted within the scope of their employment. *See Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 (Tex. 1998). Employers are held liable for the conduct of their employees because employers generally have the right to control the means and methods of the employees' work.

79.     In the instant case, Defendants are responsible for the negligence of their employees' actions in operating the Biosecurity Level 4 lab in Wuhan, China. Defendants had been warned repeatedly that their lab safety procedures were inadequate. In addition, Defendants' employees were collecting and studying live COVID-19 samples taken from bats. This negligent operation of the lab and the collection, storage, and improper disposal of the COVID-19 virus led to Plaintiffs' personal injury and economic damages.

80.     The acts of Defendants' employees were the proximate cause of personal injuries and economic losses suffered by the class members. These personal injuries include death, hospitalization, infection, permanent damage to lungs, and other physical ailments.

## XIV. SIXTH CAUSE OF ACTION
### (Economic Losses)

81.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

82.     In Texas, Plaintiffs can recover economic losses stemming from Defendants' intentional torts. *See Sharyland Water Supply Corp. v. City of Alton,* 354 S.W.3d 407, 418 (Tex. 2011).

83.     In the instant case, Defendants intentionally operated a Biosecurity Level 4 lab in Wuhan, China. Defendants intentionally collected, harvested, and studied live COVID-19 virus samples from bats in Southern China.

84.     Defendants were aware that they were exposing the populace to a severe and dangerous condition – specifically studying active and novel coronaviruses that had not yet been transmitted to humans.

85.     Once the outbreak occurred, Defendants then intentionally attempted to stop news about the outbreak by imprisoning, sequestering, and charging scientists with disorderly conduct and other crimes against the state.

86.     Defendants then intentionally spread a false report that the COVID-19 virus was released in China by the U.S. Army and the United States.

87.     Defendants intentional study of COVID-19 and the intentional cover-up about the spread of the pandemic led to death, loss of jobs, loss of livelihoods, and economic losses to the class members.

88.     As a result, Plaintiffs and the class have suffered economic losses including loss of jobs, business revenue, and other losses.

# XV. SEVENTH CAUSE OF ACTION
## (Unjust Enrichment)

89.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as if fully set forth herein.

90.     Defendants improperly received and continue to improperly receive from Plaintiffs and class members millions of dollars as result of the conduct alleged above, through the sale of PPE (Personal Protective Equipment) to class members. This PPE is used by class members to protect themselves from a pandemic created by Defendants' intentional and negligent actions.

91.     In the instant case, Defendants intentionally operated a Biosecurity Level 4 lab in Wuhan, China. Defendants intentionally collected, harvested, and studied live COVID-19 virus samples from bats in Southern China.

92.     Defendants were aware that they were exposing the populace to a severe and dangerous condition – specifically studying active and novel coronaviruses that had not yet been transmitted to humans.

93.     Once the outbreak occurred, Defendants then intentionally attempted to stop news about the outbreak by imprisoning, sequestering, and charging scientists with disorderly conduct and other crimes against the state.

94.     Defendants then intentionally spread a false report that the COVID-19 virus was released in China by the U.S. Army and the United States.

95.     Defendants intentional study of COVID-19 and the intentional cover-up about the spread of the pandemic led to death, loss of jobs, loss of livelihoods, and economic losses to the class members.

96.     In the instant case, Defendants negligently operated a Biosecurity Level 4 Containment Lab in Wuhan, China that led to an outbreak of COVID-19.

97.     Defendants were negligent in the collection and study of novel coronaviruses in bats, including COVID-19, a virus that is fatal to humans.

98.     Defendants were negligent in the disposal of the COVID-19 sample. A lab tech was ordered to destroy various active COVID-19 samples. However, due to improper training and safety protocols, the lab tech became infected with COVID-19 and then released the contagion into the general population.

99.     Defendants discovered the release of COVID-19 into the general population then intentionally began a cover-up to hide the release.

100.    Defendants then began a disinformation campaign that blamed the United States and the United States Army as the source of the COVID-19 outbreak.

101.    Defendants' negligence was the proximate cause of personal injuries suffered by the class members. These personal injuries include death, hospitalization, infection, permanent damage to lungs, and other physical ailments.

102.    Defendants' unjust enrichment by selling PPE (Personal Protective Equipment) to Plaintiffs and class members to mitigate a virus released by the Defendants is unconscionable. Defendants created a hazardous condition, then profited by selling equipment to class members to mitigate that hazard.

103.    As a result, Plaintiffs and the class have conferred a benefit on Defendants to which Defendants are not entitled.  Defendants have knowledge of this benefit, wrongfully and deceptively obtained this benefit, and have voluntarily accepted and retained the benefit conferred to it.  Defendants will be unjustly enriched if they are allowed to retain such funds and therefore, a constructive trust should be imposed on all

monies wrongfully obtained by Defendants and the money should be disgorged from Defendant, and returned to Plaintiffs and the class.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray this Court enter a judgment against Defendants that:

A.    This action be certified and maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and certify the proposed class as defined;

B.    Awards compensatory and/or punitive damages as to all Causes of Action where such relief is permitted;

C.    Awards Plaintiffs and proposed class members the costs of this action, including reasonable attorney's fees and expenses;

D.    Orders Defendants to immediately cease their wrongful conduct as set forth above;

E.    Awards equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting Defendant's ill-gotten gains, to ensure that Plaintiffs and proposed class members have an effective remedy;

F.    Awards pre-judgment and post-judgment interest at the legal rate; and

G.    Such further legal and equitable relief as this Court may deem just and proper.

DATED: May 3, 2020                    Respectfully submitted,

**THE ROSALES LAW FIRM, LLC**
OMAR W. ROSALES
Texas Bar No. 24053450
14846 Valencia Cir S
Harlingen, TX 78550
(512) 955-0579 Tel
www.owrosales.com

By:     /s/ Omar W. Rosales
        Omar W. Rosales
        Lead Counsel for Class
        Pending Admission *Pro Hac Vice*